IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| DELTA DENTAL OF IOWA, | ) | Case No. _____ |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **COMPLAINT AND JURY DEMAND** |
| ALLIED WORLD SPECIALTY | ) | |
| INSURANCE COMPANY and RSUI | ) | |
| INDEMNITY COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |

The Plaintiff, Delta Dental of Iowa, states the following for its Complaint and Jury Demand.

## INTRODUCTION

1.     This is an action for declaratory relief and damages arising from the wrongful denial of a defense and indemnity by the defendant insurance companies.  Plaintiff Delta Dental of Iowa is the leading provider of dental care insurance in Iowa.  Delta Dental of Iowa procured from the Defendants, respectively, primary and excess liability insurance coverage for, among other things, claims alleging violations of the antitrust laws.  Delta Dental of Iowa, among numerous other similar dental insurers, has become a defendant in a national series of class action lawsuits that have been consolidated into a single proceeding pending in the United States District Court for the Northern District of Illinois.  The lawsuits allege antitrust claims that are plainly within the scope of the policies issued by the Defendants.  Nonetheless, the Defendants have denied Delta Dental of Iowa a defense and indemnity, principally on the strength of a claimed policy exclusion for managed care activities.  The Defendants have seriously and abusively misread that exclusion.  Alternatively, if the exclusion applies in this situation, the

- 1 -

policies' antitrust protection of Delta Dental of Iowa is effectively worthless, and Delta Dental of Iowa is entitled to a defense and coverage either because the policies are illusory contracts or because they frustrate Delta Dental of Iowa's reasonable expectations.  Delta Dental of Iowa seeks from this Court a declaration establishing its right to a defense and indemnity, reformation of the policies to the extent necessary to establish that defense and indemnity right, and damages for the Defendants' breaching and improper behavior.

## PARTIES

2.      Delta Dental of Iowa ("DDIA") is a corporation organized and existing under the laws of the State of Iowa with its principal place of business in the State of Iowa.

3.      Allied World Specialty Insurance Company ("Allied World") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in the State of New York.

4.      RSUI Indemnity Company ("RSUI") is a corporation organized and existing under the laws of the State of New Hampshire with its principal place of business in the State of Georgia.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because the Plaintiff and the Defendants are citizens of different states, and the amount in controversy exceeds $75,000 exclusive of interest and costs.

6.      Allied World is subject to personal jurisdiction in this Court both because Allied World is licensed to do business as an insurer in Iowa, and because Allied World formed a contract with DDIA to be performed in Iowa and engaged in numerous communications in Iowa, directly and through its agents, pursuant to that contractual relationship.

7.     RSUI is subject to personal jurisdiction in this Court both because RSUI is licensed to do business as an insurer in Iowa and because RSUI formed a contract with DDIA to be performed in Iowa and engaged in numerous communications in Iowa, directly and through its agents, pursuant to that contractual relationship.

8.     Venue is proper in this jurisdiction pursuant to 28 U.S.C. § 1391(a).

9.     This action is commenced, in part, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq*.

10.     As shown below, there is an actual and justiciable controversy between DDIA and Allied World with regard to the coverage provided under the terms of a Healthcare Organizations Management Liability Package Policy, policy number 0311-5412, sold to DDIA by Allied World for the policy period October 1, 2019 through October 1, 2020 ("the Policy").  A copy of the Policy is attached hereto as Exhibit 1.  A declaratory judgment by this Court will affect the rights and interests of the parties.

11.     In addition, as shown below, there is an actual and justiciable controversy between DDIA and RSUI with regard to the coverage provided under the terms of an Excess Liability Policy, policy number HS683519, sold to DDIA by RSUI for the policy period October 1, 2019 through October 1, 2020 ("the Excess Policy").  A copy of the Excess Policy is attached hereto as Exhibit 2.  A declaratory judgment by this Court will affect the rights and interests of the parties.

## FACTUAL ALLEGATIONS

### The Policy

12.     DDIA is the Named Insured under the Policy.  The Policy, Declarations, Item 1.

13.     The Policy includes Directors and Officers Liability Coverage ("D&O Coverage Section") and Employment Practices Liability Coverage ("EPL Coverage Section").  The Policy, Declarations, Item 3.

14.     The D&O Coverage Section is explicitly incorporated and made part of the Policy.  The Policy, D&O Coverage Section, Introductory Clause.

15.     The D&O Coverage Section has a $5,000,000 limit for each Claim and an aggregate limit of liability of $10,000,000, with defense costs included within the limit of liability. The Policy, Declarations, Item 4.A and Item 4.B.

16.     Among other items in the D&O Coverage Section, the Policy includes "Company Claims Coverage" and "Antitrust Activities Coverage."   The Policy, D&O Coverage Section, § I.C and I.D.

17.     The Company Claims Coverage provides as follows:

> The Insurer shall pay on behalf of the Company the Loss arising from a Claim, first made during the Policy Period (or Discovery Period, if applicable) against the Company for a Wrongful Act, and reported to the Insurer in accordance with Section V. of the General Terms and Conditions.

The Policy, D&O Coverage Section, § II.C.

18.     The Antitrust Activities Coverage provides as follows:

> The Insurer shall pay on behalf of the Insureds, subject to the Sublimit of Liability set forth in Item 4.F. of the Declarations, the Loss arising from a Claim, first made during the Policy Period (or Discovery Period, if applicable) against the Insureds for Antitrust Activities, and reported to the Insurer in accordance with Section V. of the General Terms and Conditions.

The Policy, D&O Coverage Section, § II.D.

19.     The Policy defines "Antitrust Activities" as follows:

> [P]rice fixing; restraint of trade; monopolization; unfair trade practices; or a violation of the Federal Trade Commission Act, as amended, the Sherman Act [,] the Clayton Act, as amended, or any other federal statute involving antitrust, monopoly, price fixing, price discrimination, predatory pricing or restraint of trade activities, or of any rules or regulations promulgated under or in connection with any of the foregoing statutes, or of any similar provision of any federal, state or local statute, rule or regulation or common law.

The Policy, D&O Coverage Section, § II.B.

20. The Antitrust Coverage is unique within the Policy insofar as it has its own retention amount and is subject to co-insurance. The Policy, Declarations, Item 4.A and Endorsement No. 2 Antitrust Coverage Subject to Co-Insurance.

21. Namely, the retention for each Antitrust Claim is $125,000, and DDIA has to pay 20% of any Loss for an Antitrust Claim.

22. The Policy defines "Loss" as:

(1) damages (including back pay and front pay), settlements or judgments;

(2) pre-judgment or post-judgment interest;

(3) legal costs or attorney's fees awarded by a court in favor of the claimant;

(4) punitive or exemplary damages, or the multiple portion of any multiplied damages award, subject to any applicable Sublimit of Liability (including the multiple or liquidated damages awarded pursuant to the Age Discrimination in Employment Act or Equal Pay Act), but only to the extent such damages are insurable under the applicable law most favorable to the insurability of such damages; and

(5) Defense Costs.

"Loss" does not include:

(a) amounts which an Insured is not legally obligated to pay;

(b) taxes;

(c) fines or penalties, if insurable under law;

(d) amounts deemed uninsurable under law;

(e) costs or liability incurred by any Insured to modify any building or property to make it more accessible or

> accommodating to any disabled person, or in connection with any educational, sensitivity or other corporate program, policy or seminar;
>
> (f)　amounts paid or incurred by the Company to comply with a judgement or settlement for non-monetary or injunctive relief;
>
> (g)　Stock Benefits due or to become due or the equivalent value of such Stock Benefits; or
>
> (h)　any future compensation, including any Benefits, for any person hired, promoted or reinstated pursuant to a judgment, settlement, order or other resolution of a Claim.
>
> However, this Coverage Section shall provide coverage for Defense Costs incurred in a Claim seeking amounts specified in paragraphs (a) through (h) above, subject to all other terms, conditions and exclusions of this Policy.

The Policy, D&O Coverage Section, § II.M.

23.　Under Endorsement No. 5 of the Policy, Allied World has a broad Duty to Defend. Specifically:

> As part of and subject to the applicable Limit of Liability set forth in Item 4. of the Declarations, the Insurer will have the right and duty to defend any Claim which is covered in whole or in part under the Insuring Agreements, even if such Claim is groundless, false or fraudulent.

The Policy, Endorsement No. 5, § 1.A.

24.　Thus, Allied World must defend "any Claim" for which some coverage exists, even if not all parts of the Claim are covered. The Policy, Endorsement No. 5, § 1.A.

25.　Further, under the Policy, Allied World is obligated to pay Defense Costs:

> The Insurer shall pay Defense Costs [in] excess of the applicable Retention, subject to all other terms and conditions of this Policy. In the event and to the extent that the Insureds shall not be entitled to payment of such Defense Costs under the terms and conditions of this Coverage Section, such payments by the Insurer shall be repaid to the Insurer by the Insureds, severally and according to their respective interests.

The Policy, Endorsement No. 5, § 1.E.

26.     "Defense Costs" include, among other things, "reasonable and necessary fees, costs, charges or expenses resulting from the investigation, defense or appeal of a Claim…." The Policy, D&O Coverage Section, § II.F.

27.     The Policy defines "Claim" as, among other things, any:

(1)     written demand for monetary, non-monetary or injunctive relief made against an **Insured**; [or]

(2)     judicial, administrative or regulatory proceeding, whether civil or criminal, for monetary, non-monetary or injunctive relief, commenced against an **Insured**, including any appeal therefrom, which is commenced by:

(a)     service of a complaint or similar pleading;

(b)     return of an indictment or similar document (in the case of a criminal proceeding); or

(c)     receipt or filing of a notice of charges; ….

The Policy, D&O Coverage Section, § II.B.

28.     In pertinent part, the Policy defines "Wrongful Act" as:

(1)     any actual or alleged act, error, omission, neglect, breach of duty, misstatement or misleading statement by an Insured Person in his or her capacity as such, or any matter claimed against an Insured Person by reason of his or her status as such;

* * *

(3)     with respect to the Company, any actual or alleged act, error, omission, neglect, breach of duty, misstatement or misleading statement by the Company;

(4)     with respect to the Company and Insured Persons, any actual or alleged act, error or omission in connection with the performance of or failure to perform Provider Selection Practices ….

The Policy, D&O Coverage Section, § II.Z.

29.     The Policy defines "Related Claims" as "all Claims for Wrongful Acts based upon, arising out of, or in consequence of the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances, situations, transactions or events." The Policy, General Definitions, § II.F.

30.    The Policy provides that:

> All Related Claims shall be deemed to be a single Claim made on the date on which the earliest Claim within such Related Claims was first made, or when the earliest Claim within such Related Claims is treated as having been made in accordance with Section V.C. above, whichever is earlier.  In such event, only one Limit of Liability and one Retention shall apply.

The Policy, Notice of Claim, § V.D.

31.    The Policy contains a number of exclusions from coverage.   One of them, Exclusion (N) (the "Managed Care Exclusion") provides that:

> [T]his Coverage Section shall not cover any Loss in connection with any Claim…alleging, arising out of, based upon, or attributable to, any actual or alleged act, error or omission in the performance of, or failure to perform, Managed Care Activities by any Insured or by any individual or entity for whose acts, errors or omissions an Insured is legally responsible, except that this Exclusion shall not apply to that portion of an otherwise covered Claim for Provider Selection Practices.

The Policy, D&O Coverage Section, § III.N.

32.    The Policy defines "Managed Care Activities" as:

> [A]ny of the following services or activities: Provider Selection Practices; Utilization Review; advertising, marketing, selling, or enrollment for health care, workers' compensation, life, dental, vision, short-term disability, long-term disability, behavioral health, pharmacy benefit and consumer-directed health plans; claim services; establishing health care provider networks; reviewing the quality of Medical Services or providing quality assurance; design and/or implementation of financial incentive plans; wellness or health promotion education; development or implementation of clinical guidelines, practice parameters or protocols; triage for payment of Medical Services; and services or activities performed in the administration or  management of health care, workers' compensation, life, dental, vision, short-term disability, long-term disability, behavioral health, pharmacy benefit and consumer-directed health plans.

The Policy, D&O Coverage Section, § II.Q.

33.     The Policy defines "Provider Selection Practices" as:

[T]he process of evaluating, by members of a formal duly constituted professional review board or committee, any individual or entity for the purpose of selecting, contracting with or credentialing providers for Medical Services, including peer review, but only if performed by a Company which is not a Managed Care Organization.

The Policy, D&O Coverage Section, § II.V.

34.     The Policy defines "Managed Care Organization" as:

[A]ny entity which performs Managed Care Activities, including but not limited to health maintenance organizations, physician-hospital organizations, independent practice associations, preferred provider organizations and management services organizations; except that Managed Care Organization shall not include a Company solely in its capacity as a provider of Medical Services, or any Subsidiary whose sole purpose is to provide insurance services exclusively to one or more Companies or its employees.

The Policy, D&O Coverage Section, § II.R.

**The Excess Policy**

35.     The Excess Policy provides coverage for "Directors and Officers Liability" (the "D&O Excess Coverage").  The Excess Policy, Declarations, Item 5. Coverage.

36.     The D&O Excess Coverage has a $5,000,000 limit of liability.   The Excess Policy, Declarations, Item 3, Limit of Liability.

37.     The Excess Policy has an Excess Drop Down Provision Endorsement relating to the Antitrust Coverage, which provides "[s]olely in connection with Anti-Trust, this policy shall drop down and be excess of the Followed Policy's $5,000,000 for such Anti-Trust."  The Excess Policy, Excess Drop Down Provision Endorsement.

38.     The Excess Policy follows the Policy, and expressly provides that the Policy issued by Allied World is the "Primary Policy" and the Excess Policy issued by RSUI is the "Underlying Excess Policy."  The Excess Policy, Declarations, Item 8. Underlying Insurance.

39.     Specifically, the Excess Policy defines the "Followed Policy" as the Policy issued by Allied World, and further defines the "Underlying Insurance" as the Primary Policy (issued by Allied World) and the Excess Policy (issued by RSUI).   The Excess Policy, Definitions, Section, § II.A and § II.D.

40.     The Excess Policy provides that:

> The Insurer shall be liable to pay Loss only after any combination of the Insured and all Insurers that issued the Underlying Insurance shall have paid the full amount of the limits provided by the Underlying Insurance.  The Insurer shall then be liable to pay only such additional amount up to the Limit of Liability set forth in Item 3. (A) of the Declarations Page.

The Excess Policy, Limit of Liability and Payments Under Underlying Insurance, Section, § III.A.

41.     The Excess Policy follows the Policy.  Specifically, the Excess Policy:

> [I]s subject to the same terms, conditions, other provisions and endorsements (except as regards the premium, the amount and limits of liability, and duty to defend, and except as otherwise provided herein) as are contained in the Followed Policy as such policy has been represented to the Insurer to be issued, or as may be added at a later time to restrict coverage. Any changes made to such Followed Policy to expand or broaden it shall be effective as part of this policy solely where accepted in writing by the Insurer.

The Excess Policy, Maintenance of Underlying Insurance, Section, § IV.A.  In other words, all of the definitions and exclusions contained in the Policy relevant to DDIA's right to a defense and an indemnity as alleged in this action also apply to, and bind RSUI regarding, the Excess Policy.

42.     The Policy and the Excess Policy are collectively referred to herein as "the D&O Policies."

43.     In addition to the Policy with Allied World and the Excess Policy with RSUI that provide D&O Coverage, DDIA has a Managed Care Errors and Omission Liability Policy, issued by Atlantic Specialty Insurance Company ("Atlantic"), No. MCR-10984-19 (the "E&O Policy").  A copy of the E&O Policy is attached hereto as Exhibit 3.

44.     On March 3, 2020, Atlantic agreed to defend DDIA in the Antitrust Litigation subject to a reservation of rights.

45.     Specifically, and among other grounds, Atlantic reserved its right to deny or limit coverage based on Section I of the E&O Policy as relates to the definitions of "Antitrust Activity," "Managed Care Activity," and the words "you" and "your" and based on Section III.C. of the E&O Policy as relates to the definitions of "Claim" and "Related Claims."

46.     In addition, and among other grounds, Atlantic reserved it right to deny or limit coverage based on certain Exclusions in the E&O Policy.

47.     The E&O Policy provides coverage up to a limit of $5,000,000.

48.     Because the existence and coverage of the E&O Policy do not negate the obligations of the Defendants under the Policy and the Excess Policy, because Atlantic has asserted a reservation of rights, and because, on information and belief, DDIA's exposure for covered Loss under the E&O Policy, and under the Policy, could exceed the limits of one or both of those two policies, DDIA has a need for and a right to a defense and indemnity under both the Policy and the Excess Policy.

**The Underlying Antitrust Claims**

49.     In October and November 2019, a number of dental service providers filed several class actions against various Delta Dental entities (the "Delta Dental Entities") alleging violations of antitrust laws.  DDIA is a defendant in certain of these class actions and timely reported the claims to Allied World and RSUI during the Policy Period in each of the Policies.

50.     These actions have been consolidated into a single multidistrict litigation ("MDL") case in the United States District Court for the Northern District of Illinois.

51.     On November 26, 2019, the plaintiffs filed their consolidated complaint for the Antitrust Litigation, creating the MDL litigation styled *In Re: Delta Dental Antitrust Litigation*, No. 1:19-cv-06734 (the "Consolidated Complaint").  The Consolidated Complaint is attached hereto as Exhibit 4.

52.     Additional class actions have been filed that, like the Consolidated Complaint, allege violations of antitrust laws.  These additional actions have either been transferred as related cases to be coordinated with the Consolidated Complaint, or motions to transfer and coordinate or to consolidate are pending.  Collectively, the Consolidated Complaint and these additional class actions are referred to as "the Antitrust Litigation."

53.     The plaintiffs in the Antitrust Litigation allege, among other things, that the Delta Dental Entities, including DDIA, violated federal antitrust laws and engaged in price fixing and/or anticompetitive activities.

54.      The lawsuits consolidated into the Antitrust Litigation constitute a Claim and/or Related Claims under the Policy.

55.     Some or all the allegations in the Antitrust Litigation fall squarely within the coverage afforded by the Policy and the Excess Policy and no exclusion applies.

56.     Alternatively, to the extent the language in the Managed Care Exclusion or other language in the Policy is interpreted to exclude coverage for the Antitrust Litigation, the coverage provided by the Policy and the Excess Policy is, as a matter of contract law, illusory and DDIA is receiving nothing in consideration for the premiums it has paid for its antitrust coverage.

57.     Alternatively, to the extent the language in the Managed Care Exclusion or other language in the Policy is interpreted to exclude coverage for the Antitrust Litigation, the lack of antitrust coverage provided by the Policy and the Excess Policy frustrate, and have frustrated, the reasonable expectations of DDIA as an insured under Iowa law governing the enforcement of insurance contracts.

**Allied World Denies Coverage and Refuses to Defend**

58.     Under the Policy DDIA provided timely notice of the Antitrust Litigation to Allied World.

59.     At that same time under the Excess Policy, DDIA provided timely notice of the Antitrust Litigation to RSUI.

60.     On February 21, 2020, Allied World denied coverage under the Policy for the Antitrust Litigation. A copy of the February 21, 2020 coverage denial letter is attached hereto as Exhibit 5.

61.     Although Allied World denied coverage, it acknowledged that "based upon the foregoing, it appears that Insuring Agreements C [Company Claims Coverage] and D [Antitrust Activities Coverage] are arguably implicated by the allegations in the Consolidated Complaint." Exhibit 5 at 3.

62.     In addition, Allied World has "agree[d] to recognize the other lawsuits and the Consolidated Complaint as a single Claim deemed to have been first made during the Policy Period, subject to a single retention and single limit of liability."  Exhibit 5 at 4.

63.     On March 4, 2020, DDIA's broker for the Policy, RT ProExec, sent Allied World an email contesting the denial of coverage on behalf of DDIA.  A copy of the March 4, 2020 email is attached hereto as Exhibit 6.

64.     On March 19, 2020, Allied World sent an email to RT ProExec in which Allied World continued to deny coverage.  A copy of the March 19, 2020 email is attached hereto as Exhibit 7.

65.     On May 5, 2020, counsel for DDIA sent a letter to Allied World contesting the denial of coverage and requesting certain information and documentation.  A copy of the May 5, 2020 letter is attached hereto as Exhibit 8.

66.     On May 29, 2020, RT ProExec sent Allied World a letter further contesting the denial of coverage and providing additional authority.  A copy of the May 29, 2020 letter is attached hereto as Exhibit 9.

67.     On July 2, 2020, Allied World sent a letter to RT ProExec in which it continued to maintain its denial of coverage.  A copy of the July 2, 2020 letter is attached hereto as Exhibit 10.

68.     On August 21, 2020, counsel for Allied World sent a letter to counsel for DDIA in which it persisted in its reservation of rights under the Policy and, other than providing copies of DDIA's past D&O Policies, refused to provide the documentation DDIA requested on May 5, 2020.  A copy of the August 21, 2020 letter is attached hereto as Exhibit 11.

69.     On November 12, 2020, counsel for DDIA sent a letter to counsel for Allied World in which it provided additional explanation and requested additional explanation of the denial of coverage.  A copy of the November 12, 2020 letter is attached as Exhibit 12.

70.     As of the date of this filing, Allied World has not responded to the November 12, 2020 correspondence, including the requests therein.

71.     Allied World has, at all times, refused to defend DDIA in the Antitrust Litigation.

72.     As a contractual matter, the Excess Policy follows the Policy in all material respects.  Accordingly, Allied World's interpretation of the Policy as not providing a defense and coverage becomes RSUI's interpretation of the Excess Policy as well.

73.     Alternatively, because DDIA is not entitled to coverage and a defense from RSUI under the Excess Policy until the limits of the Policy are exhausted, Allied World's denial of coverage under the policy has effectively denied DDIA's ability to obtain any coverage or defense under the Excess Policy.

74.     Alternatively, Allied World acts as RSUI's agent for the purpose of stating coverage positions, denials, and reservations under the Excess Policy, and Allied World's statements, actions, and refusals to act regarding coverage under the Policy are also the statements, actions, and refusals to act of RSUI under the Excess Policy.

## COUNT I: DECLARATORY JUDGMENT
## (AGAINST ALLIED WORLD AND RSUI)

75.     The allegations of paragraphs 1 through 74 of this Complaint are incorporated herein by reference, as though fully set forth herein.

76.     DDIA has paid substantial premiums to Allied World for coverage under the Policy.

77.     DDIA has at all times complied with all relevant provisions of the Policy, including the giving of timely notice.

78.     DDIA has paid substantial premiums to RSUI for coverage under the Excess Policy.

79.     DDIA has at all times complied with all relevant provisions of the Excess Policy, including the giving of timely notice.

80.     The Antitrust Litigation triggers Allied World's obligation to pay on behalf of DDIA for Loss arising from the Antitrust Litigation, including but not limited to Defense Costs.

81.     The Antitrust Litigation triggers Allied World's duty to defend DDIA in the Antitrust Litigation.

82.     Alternatively, to the extent the Policy does not purport to provide coverage for the Antitrust Litigation and/or purports to exclude coverage for the Antitrust Litigation, the Policy is an illusory contract as a matter of contract law and DDIA is entitled to a defense and indemnity for the Antitrust Litigation.

83.     Alternatively, to the extent the Policy does not purport to provide coverage for the Antitrust Litigation and/or purports to exclude coverage for the Antitrust Litigation, the Policy frustrates and has frustrated DDIA's reasonable expectations as an insured, and DDIA is entitled to defense and indemnity for the Antitrust Litigation.

84.     DDIA made a timely demand upon Allied World to perform its obligations under the Policy.  However, Allied World has denied coverage on the erroneous grounds that the allegations in the Antitrust Litigation do not trigger coverage and/or that certain exclusions bar coverage for the Antitrust Litigation.

85.     An actual, immediate, and justiciable controversy exists between DDIA and Allied World concerning Allied World's duty to defend DDIA in the Antitrust Litigation and Allied World's obligations under the Policy to pay or reimburse Loss, including Defense Costs incurred by DDIA in connection with the Antitrust Litigation.

86.     The threatened Loss for this Claim, including Defense Costs, exceeds the $5,000,000 limit of the Policy.  Accordingly, DDIA is entitled to a commitment from RSUI for a defense and indemnity under the Excess Policy for the Antitrust Litigation.

87.     Because the Excess Policy follows the Policy in terms of its constructions, interpretation, and effect, all of the same principles that entitle DDIA to declaratory relief against Allied World also entitle DDIA to declaratory relief against RSUI.

88.     DDIA, through its communications to Allied World, has made a timely demand upon RSUI to perform, or commit to perform, its obligations under the Excess Policy.  However, RSUI has, through the actions of Allied World and through its own inaction, denied coverage on the erroneous grounds that the allegations of the Antitrust Litigation do not trigger coverage and/or that certain exclusions bar coverage for the Antitrust Litigation.

89.     Thus, an actual, immediate, and justiciable controversy exists between DDIA and RSUI concerning RSUI's obligations under the Excess Policy to pay or reimburse Loss, including Defense Costs incurred by DDIA in connection with the Antitrust Litigation, that are in excess of the Primary Policy.

WHEREFORE, DDIA respectfully requests that this Court issue a judgment that:

(a)     declares that under the terms of the Policy, Allied World has a duty to pay on behalf of DDIA all Loss arising from the Antitrust Litigation within the limits of the Policy;

(b)      declares that under the terms of the Policy, Allied World has a duty to defend DDIA in the Antitrust Litigation;

(c)      declares that under the terms of the Excess Policy, RSUI has a duty to pay on behalf of DDIA all Loss, up to the Excess Policy limit, arising from the Antitrust Litigation in excess of the limits of the Policy;

(d)      declares that under the terms of the Excess Policy, RSUI has a duty to defend DDIA in the Antitrust Litigation when the Defense Costs of that defense exceed the limits of the Policy;

(e)      awards DDIA the costs of this action and such other relief as the Court deems appropriate.

## COUNT II: BREACH OF CONTRACT (SPECIFIC PERFORMANCE) (AGAINST ALLIED WORLD)

90.      The allegations of Paragraphs 1 through 89 of this Complaint are incorporated herein by reference, as though fully set forth herein.

91.      The Antitrust Litigation is covered in whole or in part under the Insuring Agreements, and thus is a covered Claim.

92.      Allied World, under Endorsement No. 5 of the Policy, agreed to defend DDIA for "any claim which is covered in whole or in part under the Insuring Agreements, even if such Claim is groundless, false or fraudulent." The Policy, Endorsement No. 5., § 1.A.

93.      Allied World has breached its obligation by refusing to defend DDIA in the Antitrust Litigation.

94.      DDIA has performed all its material obligations under the Policy.

95.      Allied World's breach has deprived DDIA of the tangible and intangible benefits of Allied World's defense of the Antitrust Litigation.

96.     Allied World's breaches also may cause DDIA to be forced to incur certain costs of defense, including litigation expenses, that it would not have to pay but for Allied World's failure to defend DDIA in the Antitrust Litigation, as well as, ultimately, certain losses arising from any settlement or judgment that it would not have to pay but for Allied World's failure to defend DDIA.

97.     DDIA has no adequate remedy at law because Allied World has failed to perform its specific obligation to defend DDIA, for which monetary damages alone would not adequately compensate DDIA.

WHEREFORE, DDIA respectfully requests that this Court issue a judgment that:

(a)     orders Allied World to defend DDIA in the Antitrust Litigation;

(b)     precludes Allied World from denying coverage for costs and expenses of defenses incurred before, and/or related to decisions arising before, Allied World provided a defense of DDIA for the Antitrust Litigation;

(c)     precludes Allied World from denying coverage for any amount of Loss arising out of or related to decisions arising before Allied World provided defense of DDIA for the Antitrust Litigation; and

(d)     awards DDIA the costs of this action and such other relief as the Court deems appropriate.

## COUNT III: REFORMATION OF THE POLICY AND EXCESS POLICY (AGAINST ALLIED WORLD AND RSUI)

98.     The allegations of Paragraphs 1 through 97 of this Complaint are incorporated herein by reference, as fully set forth herein.

99.     If the Policy and the Excess Policy are interpreted such that the language does not provide a defense and indemnity coverage for the Antitrust Litigation, the Policy and the Excess Policy should be reformed to provide such coverage.

100.     Reformation to provide coverage is required in equity in order to avoid the Antitrust Coverage under the Policy and the Excess Policy being illusory.

101.     Reformation to provide coverage is required in equity based upon the reasonable expectations of DDIA as to the coverage of the Policy and the Excess Policy and, in particular, their coverage for Antitrust Activities of the nature implicated in the Antitrust Litigation.

WHEREFORE, DDIA respectfully requests that this Court issue a judgment that:

(a)     reforms the Policy such that Allied World has a duty to pay on behalf of DDIA all Loss arising from the Antitrust Litigation within the limits of the Policy;

(b)     reforms the Policy such that Allied World has a duty to defend DDIA in the Antitrust Litigation;

(c)      reforms the Excess Policy such that RSUI has a duty to pay on behalf of DDIA all Loss, up to the Excess Policy limit, arising from the Antitrust Litigation in excess of the limits of the Policy;

(d)     reforms the Excess Policy such that RSUI has a duty to defend DDIA in the Antitrust Litigation to the extent DDIA's Defense Costs exceed the limits of the Policy; and

(e)     awards DDIA the costs of this action and such other relief as the Court deems appropriate.

## **COUNT IV: BAD FAITH**
## **(AGAINST ALLIED WORLD)**

102.     The allegations of Paragraphs 1 through 101 of this Complaint are incorporated herein by reference, as though fully set forth herein.

103.     DDIA's entitlement to coverage for the Antitrust Litigation is not fairly debatable.

104.     Allied World's duty to defend DDIA in the Antitrust Litigation is not fairly debatable.

105.     Allied World had no reasonable basis to deny coverage to DDIA or deny a defense to DDIA.

106.     Allied World knew or had reason to know that its denial of coverage and its denial of a defense under the Policy was without a reasonable basis.

107.     Allied World has failed to adequately investigate DDIA's Claim before denying coverage and refusing to defend DDIA in the Antitrust Litigation.

108.     In evaluating its obligations to DDIA under the Policy, Allied World has been less than honest, intelligent, and fair.

109.     In evaluating its obligations under the Policy, Allied World has failed to accord the interests of DDIA the same faithful consideration that it has given its own interests and has, instead, ignored the interests of DDIA.

110.     In evaluating its obligations under the Policy, Allied World has failed to use the same degree of care and diligence as a person of ordinary care and prudence would exercise in the management of his own business.

111.     Allied World has failed to perform its duty to read the Consolidated Complaint in the Antitrust Litigation with all doubts as to whether the claim may fall within the coverage of the Policy resolved in favor of DDIA.

112.     Allied World knowingly accepted premiums for and provided coverage to DDIA that it knew or should have known was illusory.

113.     Allied World knowingly accepted premiums for and provided coverage to DDIA that it knew or should have known frustrated DDIA's reasonable expectations.

114.     Allied World's conduct as described in Paragraphs 103 through 113 constitutes the tort of bad faith claim denial.

115.     DDIA has been damaged as a result of Allied World's bad faith conduct.

116.     Allied World's denial of coverage was willful, wanton, and/or malicious, and made with reckless indifference to the plight of DDIA, thus entitling DDIA to punitive damages.

117.     Upon information and belief, Allied World's bad faith conduct occurs with such frequency as to indicate a general business practice.

WHEREFORE, DDIA respectfully requests that this Court issue a judgment that:

(a)      awards  DDIA compensatory, consequential, and punitive damages resulting from Allied World's bad faith refusal to pay Defense Costs already incurred and to defend DDIA in the Antitrust Litigation;

(b)      awards  DDIA the court costs, attorneys' fees and interest on the judgment amount against Allied World; and

(c)      awards  DDIA  such other relief as the Court deems appropriate.

## <u>DEMAND FOR JURY TRIAL</u>

DDIA hereby demands a trial by jury as to all issues so triable.

fExTHE WEINHARDT LAW FIRM


By: /s/ Mark E. Weinhardt
      Mark E. Weinhardt           AT0008280
      Danielle M. Shelton       AT0007184
      Elisabeth A. Archer        AT0012638
      2600 Grand Avenue, Suite 450
      Des Moines, IA  50312
      Telephone:  (515) 244-3100
      E-mail:  meweinhardt@weinhardtlaw.com
            dshelton@weinhardtlaw.com
            earcher@weinhardtlaw.com




By: /s/ Thomas H. Walton
      Thomas H. Walton         AT0008183
      General Counsel
      Delta Dental of Iowa
      9000 Northpark Drive
      Johnston, IA 50131
      Telephone:  (515) 261-5505
      E-mail: twalton@deltadentalia.com

ATTORNEYS FOR DELTA DENTAL OF IOWA